## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

| | | |
|---|---|---|
| **EDDIE BILLINGSLEY,** | **)** | |
| | **)** | |
| **Plaintiff,** | **)** | |
| | **)** | |
| **v.** | **)** | **CASE NO. 1:17-cv-00066-SLC** |
| | **)** | |
| **CITY OF FORT WAYNE,** *et al.*, | **)** | |
| | **)** | |
| **Defendants.** | **)** | |

## OPINION AND ORDER

Plaintiff Eddie Billingsley sued the City of Fort Wayne (the "City") and one of its police officers, Officer Darrell Caudill, under 42 U.S.C. § 1983, alleging that Officer Caudill violated Billingsley's right under the Fourth Amendment to be free from the use of excessive force. (DE 1). Specifically, Billingsley claims that on January 7, 2016, Officer Caudill used excessive force at the hospital shortly after Billingsley's arrest, when Officer Caudill handcuffed Billingsley's left wrist above his head to a bed rail, and delivered two controlled strikes to his head when both of his wrists were handcuffed. (DE 1 ¶¶ 5-8). Billingsley also advances claims of assault and battery under Indiana law, asserting that the City is liable for Officer Caudill's actions under the doctrine of *respondeat superior*. (DE 1 ¶ 9).

Now before the Court is Defendants' motion for summary judgment, asserting that Defendants are entitled to judgment as a matter of law on Billingsley's claims because Officer Caudill used reasonable force under the circumstances, and because he is entitled to qualified immunity. (DE 24-DE 26). Billingsley filed a response brief, and Defendants filed a reply (DE 33-DE 35); with leave of Court, Billingsley then filed a sur-response, and Defendants responded with a sur-reply (DE 39-DE 40). The matter is now ripe for ruling.

For the following reasons, Defendants' motion for summary judgment will be GRANTED.

## I. FACTUAL BACKGROUND[1]

### A. The Events of January 7, 2016

On January 7, 2016, at about 6:20 p.m., the Fort Wayne Police Department ("FWPD") dispatch received a call about a disturbance at the Burger King located on West Jefferson Boulevard in Fort Wayne, Indiana. (DE 26-1 ¶ 12; DE 33-1 at 4). The caller, later identified as Matthew Heaton ("Heaton"), reported that Billingsley had threatened him with a knife. (DE 26-1 ¶ 13). Officer Caudill and another FWPD officer, Officer Heather Hoffman, went to the Burger King, where a patron told them that the two men who were involved in the disturbance had left the premises and were at the corner of Jefferson Boulevard and Barr Street. (DE 26-1 ¶ 14; DE 33-2 at 25-27, Dep. 24-26). As the two Officers began to approach that intersection in their squad car, Officer Caudill saw that Billingsley and Heaton were arguing. (DE 26-1 ¶ 15). The Officers, perceiving that Billingsley and Heaton were preparing for a physical fight, activated the squad car's lights and bumped the siren as they approached in order to get Billingsley's and Heaton's attention. (DE 26-1 ¶ 16).

Upon arrival, the Officers observed that Billingsley and Heaton were still arguing. (DE 26-1 ¶ 17). Officer Hoffman spoke with Heaton, while Officer Caudill spoke with Billingsley. (DE 26-1 ¶ 18). Because Heaton had reported to dispatch that Billingsley was armed with a knife, Officer Caudill checked Billingsley for weapons. (DE 26-1 ¶ 19). Officer Caudill

---

[1] For summary judgment purposes, the facts are recited in the light most favorable to Billingsley, the nonmoving party. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

contends that he could not perform a thorough search of Billingsley at the scene because Billingsley was wearing several layers of clothing; the search, however, did reveal a silver multi-tool with a fold-out knife, the drug Spice, and two bottles of alcohol. (DE 26-1 ¶¶ 20, 21, 37; DE 26-2 at 8-10, Dep. 26-28; DE 33-2 at 27-28, Dep. 26-27). Officer Caudill took possession of these items. (DE 26-1 ¶ 22; DE 33-2 at 27, Dep. 26).

While speaking with Billingsley, Officer Caudill observed that Billingsley had a heavy odor of alcohol on his breath; watery, bloodshot eyes; loud and slurred speech; unsteady movements; and a generally hostile demeanor, all of which Officer Caudill considered to be signs of intoxication. (DE 26-1 ¶ 23). Given Billingsley's involvement in a public altercation, and that he demonstrated several signs of intoxication, Officer Caudill arrested Billingsley for public intoxication. (DE 26-1 ¶ 24).

Billingsley was offered a breath test at the scene, but he refused to provide a breath sample; he also insisted that he would not provide a breath sample at the lock up. (DE 26-1 ¶ 25). Therefore, the Officers transported Billingsley to St. Joseph Hospital for medical clearance, as the lock up would not accept and process an individual who refuses to provide a breath sample unless that person has received medical clearance from St. Joseph Hospital. (DE 26-1 ¶¶ 26, 27; DE 33-1 at 4-5).

During the transport, Billingsley continued to act in a belligerent manner and made multiple threats. (DE 26-1 ¶ 28; DE 26-2 at 11, 13, Dep. 32, 56; DE 33-2 at 33-34, Dep. 32-33). Billingsley was yelling and cursing in the squad car, and at one point, he told Officer Caudill that he would hide in a bush and shoot Officer Caudill the next time he saw Officer Caudill. (DE 26-1 ¶ 29; DE 26-2 at 11-12, Dep. 32-33). Billingsley also demanded that he be taken directly to his

attorney because he had a "lawsuit." (DE 26-1 ¶ 30; DE 33-2 at 33-34, Dep. 32-33).

Billingsley continued to yell and curse after he and the Officers arrived at the hospital, and he was escorted to an examination room. (DE 26-1 ¶ 31; DE 33-1 at 5). Once Billingsley was on a hospital bed, Officer Caudill handcuffed Billingsley's right wrist to the bed rail, at waist level. (DE 26-1 ¶ 32; DE 33-1 at 5, 8; DE 33-2 at 43-44, Dep. 42-43; DE 34 at 00:05[2]). Billingsley continued to yell and curse from the hospital bed, even after being instructed to stop. (DE 26-1 ¶ 33). Eventually, Officer Caudill closed the door to the examination room to prevent Billingsley from disturbing other patients and hospital staff. (DE 26-1 ¶ 34; DE 33-1 at 5-6; DE 34 at 00:05). The door had a window that allowed Officer Caudill to keep watch over Billingsley from outside the room. (DE 26-1 ¶ 35; DE 33-1 at 6; DE 34 at 00:05).

Through the window, Officer Caudill observed Billingsley searching through his clothing. (DE 26-1 ¶ 36; DE 34 at 00:24-00:40). This concerned Officer Caudill because he had been unable to perform a complete search of Billingsley's person when taking him into custody, due to Billingsley wearing several layers of clothing. (DE 26-1 ¶¶ 37, 39). Based on his experience, Officer Caudill was aware that some knives and blades can be difficult to detect when an individual is wearing multiple layers of clothing, and thus, Officer Caudill was concerned that Billingsley may have had additional weapons hidden under his clothing. (DE 26-1 ¶ 38).

After searching through his clothing, Billingsley sat up and moved his body towards the end of the hospital bed as though he intended to get off the bed and stand up. (DE 26-1 ¶ 40; DE

---

[2] Both parties have submitted the same video, which has no audio, that was taken in the hospital room. (DE 27; DE 34). For ease, the Court will refer solely to Billingsley's submission of the video at Docket Entry 34.

33-1 at 6; DE 34 at 00:42). Given Billingsley's increasing agitation and the possibility of his having a weapon on his person, Officer Caudill thought it necessary to maintain control of the situation and ensure that Billingsley stayed on the hospital bed. (DE 26-1 ¶¶ 41, 42). Officer Caudill believed that Billingsley would have posed a greater risk of harm to himself, the Officers, and the hospital staff if he were allowed to get off the bed. (DE 26-1 ¶ 41).

As Officer Caudill entered the room, he instructed Billingsley to remain on the bed, but Billingsley did nothing to follow that instruction. (DE 26-1 ¶ 43; DE 34 at 00:45). Officer Caudill took Billingsley's left wrist, which was unrestrained, for the purpose of handcuffing it to the bed rail, but Billingsley tried to pull away and twist free. (DE 26-1 ¶¶ 44, 45; DE 34 at 00:48-00:56). Nevertheless, Officer Caudill, who was six feet tall and weighed 250 pounds, was able to maintain his grip on Billingsley's left wrist, "thr[o]w it behind Billingsley's head," and handcuff it to the bed rail above Billingsley's head; at that time, Billingsley felt pain and a "popping" in his left arm. (DE 26-1 ¶ 46; DE 33-1 at 20; DE 33-2 at 44, Dep. 43; DE 34 at 00:48-01:09). Officer Caudill handcuffed Billingsley's right wrist "low," at waist level, and his left wrist "high," above his head, in an effort to better control Billingsley's body on the bed. (DE 26-1 ¶¶ 32, 46; DE 33-1 at 7; DE 34 at 01:09).

Officer Caudill knew from his experience that individuals could slip out of handcuffs, that handcuffs could fail, and that bed rails, to which the handcuffs were secured, could come loose. (DE 26-1 ¶ 47; DE 33-1 at 6-8). Therefore, Officer Caudill believed that there was still a possibility Billingsley could break loose. (DE 26-1 ¶¶ 48-49; DE 33-1 at 6-8). Consequently, Officer Caudill believed that he needed to continue to monitor and maintain control over Billingsley. (DE 26-1 ¶¶ 48-49; DE 33-1 at 6-8).

5

After his left wrist was also handcuffed to the bed, Billingsley became angrier and repeatedly threatened to kill Officer Caudill the next time he saw Officer Caudill on the street. (DE 26-1 ¶ 50; DE 33-1 at 9). In an attempt to diffuse the situation, Officer Caudill stepped closer to Billingsley, placed his hand on the side of Billingsley's face, and told him he needed to calm down. (DE 26-1 ¶ 51; DE 33-1 at 9; DE 34 at 01:14-01:19). Officer Caudill also said, in an attempt to lighten the mood, that Billingsley was going to hurt Officer Caudill's feelings if he continued to threaten Officer Caudill. (DE 26-1 ¶ 52; DE 33-1 at 10). Billingsley, however, did not calm down, and Officer Caudill contends that he felt fearful and threatened by Billingsley. (DE 26-1 ¶¶ 53, 54; Dep. 33-1 at 10). Officer Caudill stood nearby Billingsley because he was concerned about what Billingsley might do next. (DE 26-1 ¶¶ 53, 54; DE 34 at 01:19-01:29).

As Officer Caudill stood to the left of the hospital bed, Billingsley, acting out of anger and frustration over Officer Caudill's causing pain and "popping" in his left arm, suddenly twisted his lower body and kicked with his right foot at Officer Caudill's abdomen, threatening to "kick [Officer Caudill's] ass." (DE 26-1 ¶ 55; DE 33-1 at 11-14; DE 33-2 at 44, Dep. 43; DE 34 at 01:30-01:31). Billingsley states that he did not actually connect with Officer Caudill's abdomen, and that he was aiming for Officer Caudill's head (DE 33-2 at 44-45, Dep. 43-44); Officer Caudill, however, contends that the kick made contact with his abdomen and caused him pain. (DE 26-1 ¶ 56; DE 33-1 at 11-14, 27). The video is not definitive as to whether Billingsley's kick did, or did not, make contact with Officer Caudill's abdomen. (DE 34 at 01:30-01:31).

Officer Caudill states that based on his experience and training, he knew that he needed to regain control of the situation in light of Billingsley's kick. (DE 26-1 ¶¶ 57, 61; DE 33-1 at

14-15). Within a tenth of a second after the kick, Officer Caudill delivered two controlled strikes to the side of Billingsley's head to achieve mental stunning so that Billingsley would become compliant and no longer pose a risk of harm to himself or others.[3] (DE 26-1 ¶ 63; DE 33-1 at 14-17, 20; DE 34 at 01:30-01:38). Officer Caudill states that he used the amount of force necessary to overcome Billingsley's resistance. (DE 33-1 at 20). At no time did Officer Caudill attempt to gain control of Billingsley's leg before delivering the strikes to his head. (DE 33-1 at 16; DE 34 at 01:30-01:38). The strikes achieved mental stunning, and Billingsley remained stunned long enough to allow Officer Hoffman to enter the room, retrieve leg restraints from the squad car, and secure Billingsley's legs to the bed. (DE 26-1 ¶ 65; DE 33-1 at 26-27; DE 34 at 01:40-02:33). After Billingsley's legs were secured to the bed, Officer Caudill kept watch over Billingsley through the window to monitor his behavior and the laceration and swelling that had developed on the left side of Billingsley's face from the strikes. (DE 26-1 ¶ 66; DE 34 at 02:33-03:13). Billingsley also contends that Officer Caudill's strikes knocked out two teeth from his dentures. (DE 33-2 at 34-39, 72-73, Dep. 33-39, 71-72).

When Billingsley became more oriented, he began to act in a hostile manner again. (DE 26-1 ¶ 67). Billingsley continued to act in a hostile and belligerent manner when hospital staff arrived to examine him. (DE 26-1 ¶ 68; DE 26-2 at 13, Dep. 56). Billingsley refused to cooperate with them or answer their questions. (DE 26-1 ¶ 68). Eventually, hospital staff were able to check Billingsley's vital signs and run medical tests, and the tests revealed that Billingsley had a pre-existing cardiovascular problem. (DE 26-1 ¶ 69). Hospital staff

---

[3] While Officer Caudill testified that he delivered two strikes to Billingsley's head, Officer Caudill stated in his narrative report at the time that he delivered three strikes to Billingsley's head. (*See* DE 33-4 at 3). The video shows that Officer Caudill delivered just two strikes to Billingsley's head. (DE 34 at 01:30-01:38).

determined that Billingsley should be kept overnight for observation. (DE 26-1 ¶ 70).

Therefore, the Officers released Billingsley to the hospital's care and left. (DE 26-1 ¶ 70).

The hospital testing revealed that Billingsley's blood alcohol content was .329. (DE 33-2 at 30-31, Dep. 29-30). Billingsley later testified that he started drinking sometime between 10:00 a.m. and 11:00 a.m. that day, and that by the time he encountered Officer Hoffman and Officer Caudill, he had consumed two half-pints of gin and smoked two joints of Spice. (DE 33-2 at 19-21, Dep. 18-20).

*B. FWPD's Use of Force Policy*

Officer Caudill testified that he "reflected" on what to do to gain control over Billingsley after Billingsley delivered the kick to Officer Caudill's abdomen, and that his strikes to Billingsley's face were part of a "deliberative process." (DE 33-1 at 15-17). Officer Caudill testified about the FWPD's "Firearms/Use of Force Policy, PD 97-2401," which states, in relevant part:

> [I]t is the policy of this department that police officers shall use only that force which appears reasonably necessary to effectively bring an incident under control, while protecting the lives of the officer or another. Only that amount of force necessary to overcome the resistance being offered shall be used.

(DE 33-5 at 1; DE 33-1 at 17-18).

The use of force policy includes a "resistance control continuum." (DE 33-1 at 18; DE 33-5 at 3). The first step on the continuum is "officer presence"; the second is "verbal direction"; the third is "soft empty hand technique," which includes the use of temporary restraining devices such as handcuffs and leg restraints; and the fourth is "hard empty hand technique." (DE 33-1 at 18-21, 25-26; DE 33-2 at 3-4). Officer Caudill testified, however, that

8

officers do not follow a continuum every time, but rather escalate or de-escalate as needed under the circumstances presented. (DE 33-1 at 19-21).

## II. SUMMARY JUDGMENT STANDARD

On a motion for summary judgment, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Payne*, 337 F.3d at 770. When ruling on a motion for summary judgment, "a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Payne*, 337 F.3d at 770 (citations omitted). "The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) (citations omitted).

If the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party, summary judgment may not be granted. *Payne*, 337 F.3d at 770. A court must construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true[,]" as "summary judgment cannot be used to resolve swearing contests between litigants." *Id.* (citations omitted). However, "a party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id.* at 771 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

# III. ANALYSIS

## A. Law Pertaining to Excessive Force

A claim of "excessive force . . . in the course of an arrest . . . [is] properly analyzed under the Fourth Amendment's 'objective reasonableness' standard . . . ."[4] *Graham v. Connor*, 490 U.S. 386, 388 (1989); *see also Scott v. Harris*, 550 U.S. 372, 381 (2007). This gives rise to the overarching question, "whether [the officer's] actions were objectively reasonable." *Scott,* 550 U.S. at 381. Answering this question "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (citation omitted).

At bottom then, the inquiry focuses on whether the officer's actions were "'objectively reasonable' in light of the facts and circumstances confronting [him], without regard to their underlying intent or motivation." *Id*. at 397. This means that the Court must view the matter "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396 (citation omitted). Consequently, a "police officer's use of force is unconstitutional if, judging from the totality of the circumstances at the time of the arrest, the officer used greater force than was reasonably necessary to make the arrest." *Payne*, 337 F.3d at 778 (citation and internal quotation marks omitted); *see also Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985) (stating that the court must look to whether the totality of the circumstances justified

---

[4] "[T]he protections of the Fourth Amendment apply at arrest and through the . . . probable cause hearing, due process principles govern a pretrial detainee's conditions of confinement after the judicial determination of probable cause, and the Eighth Amendment applies following conviction." *Lopez v. City of Chi.*, 464 F.3d 711, 719 (7th Cir. 2016). Here, the alleged excessive force occurred subsequent to Billingsley's arrest but before a probable cause hearing, and the parties do not dispute that the Fourth Amendment applies.

the seizure).

Proper application of the reasonableness standard requires "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (citation omitted). "[This] calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Horton v. Pobjecky*, 883 F.3d 941, 950 (7th Cir. 2018) (citing *Graham*, 490 at 396-97). "'Not every push or shove, even if it may later seem unnecessary in the peace of the judge's chambers,' violates the Fourth Amendment." *Stilley v. Herschberger*, No. 3:07-CV-172 JVB, 2008 WL 4889710, at *2 (N.D. Ind. Nov. 12, 2008) (quoting *Graham*, 490 U.S. at 396).

### B. Officer Caudill's Handcuffing of Billingsley's Left Wrist

Billingsley does not respond to Defendants' argument seeking judgment as a matter of law on Billingsley's allegations of excessive force arising from Officer Caudill's handcuffing of his left wrist above his head. Rather, Billingsley's argument centers on the two strikes that Officer Caudill delivered to Billingsley's head after both of his wrists were handcuffed. (*See* DE 33 at 7-17). Therefore, Billingsley apparently has abandoned his excessive force claim arising from Officer Caudill's handcuffing of his left wrist. *See Palmer v. Marion Cty.*, 327 F.3d 588, 597-98 (7th Cir. 2003) ("[B]ecause [the plaintiff] failed to delineate his negligence claim in his district court brief in opposition to summary judgment or in his brief to this Court, his negligence claim is deemed abandoned." (citations omitted)).

"A non-movant's failure to address claims in response to a motion for summary judgment waives those claims." *Jones v. LaPorte Cty. Sheriff's Dept.*, No. 3:13-CV-1330 JD, 2016 WL 1254367, at *22 (N.D. Ind. Mar. 29, 2016) (citing *Palmer*, 327 F.3d at 597; *Laborers' Int'l Union of N. Am. v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999)). "Moreover, when a plaintiff makes only a perfunctory argument and fails to cite any record evidence in support of a claim, summary judgment should be granted." *Id.* (collecting cases). Therefore, summary judgment will be granted in Defendants' favor on Billingsley's claim of excessive force arising from Officer Caudill's handcuffing of Billingsley's left wrist above his head.[5]

### C. *Officer Caudill's Delivery of Two Strikes to Billingsley's Head*

Defendants argue that Officer Caudill's delivery of two controlled strikes to Billingsley's head was objectively reasonable in response to Billingsley's kick at Officer Caudill's abdomen. Officer Caudill emphasizes that although both of Billingsley's wrists were handcuffed to the bed rails at the time, handcuffs and bed rails sometimes fail, Billingsley could still fight (as demonstrated by his kick), and Officer Caudill felt fearful and threatened by Billingsley. Officer Caudill contends that he deliberated and instantaneously concluded that the first three steps on the resistance control continuum—officer presence (step one), verbal direction (step two), and soft

---

[5] Even if Billingsley had not waived this claim, summary judgment would be warranted in Defendants' favor. Billingsley admitted during his deposition that he was "angry and combative" at the hospital. (DE 26-2 at 13, Dep. 56). Billingsley does not dispute Officer Caudill's testimony that Billingsley continued to yell and curse even after being instructed to stop, that he was searching through his layers of clothing, that he was moving his body towards the end of the hospital bed as though he intended to get off the bed and stand up, and that he would have posed a greater risk of harm to himself, the Officers, and the hospital staff if he were allowed to get off the bed. (DE 26-1 ¶¶ 33-41). Consequently, on this record, no reasonable jury could conclude that Officer Caudill used excessive force against Billingsley in handcuffing his left wrist above his head. *See, e.g., Brown v. Jachowicz*, No. 15-cv-237-pp, 2017 WL 385304, at *8 (E.D. Wis. Aug. 31, 2017) (finding that the officers' use of force to restrain the plaintiff at the hospital subsequent to his arrest by using handcuffs, leg restraints, and physically holding him down during a blood draw, was "objectively reasonable" as a matter of law to protect the plaintiff, the medical staff, and the officers, given that the plaintiff was resistant and combative).

empty hand technique consisting of handcuffs and soft pressure to the face (step three)—were not effective in controlling Billingsley, and that he needed to employ the next step, hard empty hand technique. This fourth step on the continuum was indeed effective in stunning Billingsley long enough for the Officers to gain control of him and apply the leg restraints.

Billingsley, however, contends that no reasonable police officer—particularly one like Officer Caudill, who was six feet tall and weighed 250 pounds (DE 33-1 at 20)—would have felt threatened by the "slow-motion lethargic attempt at a kick" that he delivered, given that he was a "hand-cuffed, restrained, drunk [and] elderly . . . man" (DE 33 at 9-10). Billingsley emphasizes that his kick was a response to the pain caused by Officer Caudill's handcuffing of his left wrist above his head and the resulting "popping" of his left shoulder. (DE 33 at 9). Billingsley argues that a reasonable police officer would have first attempted to gain control of his leg through verbal direction and soft empty hand technique—that is, grabbing and holding his legs and applying leg restraints—before escalating the force to strikes to the head. As Billingsley sees it, a reasonable jury could conclude that the two strikes to his head by Officer Caudill was a disproportionate use of force in response to Billingsley's lethargic kick and the minimal risk of harm that he posed. *Cf. Nail v. Gutierrez*, No. 1:06-CV-292 PS, 2008 WL 4545332, at *6 (N.D. Ind. Oct. 10, 2008) (finding it important that the officers had stopped using force once the plaintiff was handcuffed, emphasizing that it was "not a case where the officers[] beat up an arrestee after he no longer posed a threat").

Contrary to Billingsley's assertions, on this record, no reasonable jury could find that Officer Caudill used a greater amount of force than was reasonably necessary under the circumstances. Billingsley concedes that he continued to actively resist Officer Caudill after both

of his wrists were handcuffed to the hospital bed, and the video reveals this as well. Obviously, Billingsley still posed a threat to Officer Caudill or anyone who may have entered the room, as evidenced by Billingsley's kick at Officer Caudill. *See Griggs v. Brewer*, 841 F.3d 308, 316 (5th Cir. 2016) (stating that where a handcuffed arrestee kicked an officer, he obviously still posed a threat to the officer); *Hamilton for J.H. v. City of Fort Wayne*, No. 1:16-CV-132-TLS, 2017 WL 5467038, at *7 (N.D. Ind. Nov. 13, 2017) (same).

Nor does Billingsley deny that he intended to hurt Officer Caudill, as he freely admitted at his deposition that he was aiming to kick Officer Caudill in the head. The only factual dispute is whether Billingsley's kick actually connected with Officer Caudill's abdomen, but that dispute is not material to the excessive force inquiry. The use of escalating force was warranted because Billingsley continued to actively resist Officer Caudill at the time, and despite the handcuffing, he was clearly not subdued and still posed a threat of harm to the Officers and the hospital staff. *See Griggs*, 841 F.3d at 316 (stating that a handcuffed arrestee who kicked at officer "was clearly *not* subdued and under restraint"); *see generally Abbott v. Sangamon Cty.*, 705 F.3d 706, 732 (7th Cir. 2013) ("[I]t is well-established in this circuit that police officers could not use significant force on *nonresisting or passively resisting* suspects." (emphasis added) (collecting cases)); *Flores v. Giuliano*, No. 12 C 162, 2014 WL 3360504, at *8 (N.D. Ill. July 9, 2014) ("Settled law holds that taking punitive actions once a suspect has been handcuffed *and subdued* is excessive force." (emphasis added) (collecting cases)).

Despite this undisputed record of Billingsley's continued resistance and threatening behavior, Billingsley contends that Officer Caudill's use of the fourth step of the resistance control continuum—the delivery of two strikes to the head— was not objectively reasonable

under the circumstances. Billingsley contends that Officer Caudill unreasonably "jumped right to continuum number 4, hard empty hand technique." (DE 33 at 3). But the video shows otherwise. The video evidences that prior to delivering the two strikes to Billingsley's head, Officer Caudill employed the first three steps on the resistance control continuum—he was present in the room with Billingsley, interacted verbally with him, and used soft hand techniques, including light pressure to Billingsley's face and handcuffing his wrists. Nevertheless, Billingsley continued to resist Officer Caudill, defy his verbal commands, verbally threaten him, and then physically kick at him.

Billingsley's argument, apparently, is that Officer Caudill should have persisted in the third step of the continuum—that is, grab and hold Billingsley's leg and control it until leg restraints could be applied—rather than progress quickly to the fourth step of delivering two strikes to the head. *See, e.g.*, *Brown*, 2017 WL 3835304, at *8 (finding the use of force at the hospital was reasonable where the officers placed the resistant and combative plaintiff in handcuffs and leg restraints and held the plaintiff down during a blood draw). But "[t]he amount of force that police officers may justifiedly use increases as the confrontation escalates." *Duncan v. Lamanna*, No. 01 C 9928, 2003 WL 21960344, at *4 (N.D. Ill. Aug. 14, 2003) (citing *Lanigan v. Vill. of East Hazel Crest, Ill.*, 110 F.3d 467, 475-76 (7th Cir. 1997)); *see Plumhoff v. Richard*, 134 S. Ct. 2012, 2020 (2014) (stating that the court must allow for the fact that police officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly-evolving about the amount of force to use in a particular circumstance).

Here, there is no dispute that Billingsley intentionally kicked Officer Caudill in or near his abdomen. "Judged in hindsight, [Officer Caudill's] split-second decision may have been slightly

disproportionate to the potential risk, but the Court does not judge the reasonableness of an officer's force with the advantage of 20/20 hindsight." *Soellinger v. Fuhrman*, No. 1:06-CV-257, 2007 WL 2114287, at *4 (N.D. Ind. July 19, 2007). "The right to make an arrest necessarily carries with it the right to some degree of physical coercion to effect it." *Sow v. Fortville Police Dep't*, 636 F.3d 293, 304 (7th Cir. 2011) (citing *Graham*, 490 U.S. at 396)).

In a situation like this, "when material facts (or enough of them to justify the conduct objectively) are undisputed, then there would be nothing for a jury to do *except* second-guess the officers, which *Graham* held must be prevented." *Bell v. Irwin*, 321 F.3d 637, 640 (7th Cir. 2003). As such, "the reasonableness of the force used is a legal question." *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010) (quoting *Bell*, 321 F.3d at 640)). It cannot be reasonably disputed that Billingsley posed a threat to the safety of the Officers and the hospital staff. By Billingsley's own testimony, he was intoxicated, uncooperative, and repeatedly verbally threatened Officer Caudill. *See, e.g.*, *Nail*, 2008 WL 4545332, at *6 (finding the officers' use of a strike to the face, pepper spray, and several strikes to the thigh objectively reasonable, where the plaintiff was drunk, confrontational, and raised his voice at the officers, had a proclivity for violence, and lunged towards an officer and tried to shove another). Officer Caudill was also on notice that Billingsley had a proclivity for violence, given that he had fought with Heaton earlier in the evening and threatened him with a knife. *See, e.g.*, *id*. Billingsley also freely admits that he intentionally kicked at Officer Caudill aiming for his head, but that his kick landed near Officer Caudill's abdomen. *See, e.g., id*.

Under these circumstances, Officer Caudill's response of delivering two strikes to Billingsley's head was objectively reasonable in order to gain control of Billingsley. *See*

*Escarcega v. Jordan*, 701 F. App'x 338, 342 (7th Cir. 2017) ("[T]he evidence shoes that

Escarcega was resisting arrest at all times when force was used, and using force, such as punches,

to gain control of a non-compliant suspect is not clearly excessive." (citation omitted)); *Johnson*

*v. Larabida Children's Hosp*., 372 F.3d 894, 898 (7th Cir. 2004) (finding the officer's use of a

single blow to the plaintiff's head with his walkie-talkie was reasonable where the plaintiff

admitted she threatened bodily harm, provoked a breach of peace at the hospital, and battered the

officer); *Prymer v. Ogden,* 29 F.3d 1208, 1216 (7th Cir. 1994) (concluding that an officer's strike

to an arrestee's face to avoid being spat on was objectively reasonable); *Nail*, 2008 WL 454332,

at *6. Therefore, summary judgment will be granted in Defendants' favor on Billingsley's

excessive force claim arising from the two strikes to his head by Officer Caudill.

### D. Qualified Immunity

Officer Caudill also asserts that Billingsley's § 1983 claims are barred by qualified

immunity. For the following reasons, the qualified immunity analysis reveals that even if there

was a constitutional violation (and the Court has already concluded above that there was not),

Officer Caudill is still entitled to summary judgment in his favor.

"Section 1983 allows citizens whose constitutional rights have been violated by public

officials to sue those officials in their individual capacities." *Gibbs v. Lomas*, 755 F.3d 529, 536

(7th Cir. 2014) (quoting *Fleming v. Livingston Cty., Ill.*, 674 F.3d 874, 878 (7th Cir. 2012)). "In

responding to such an action, a public official may raise the affirmative defense of qualified

immunity." *Id*. (citing *Jewett v. Anders*, 521 F.3d 818, 823 (7th Cir. 2008)). "Qualified immunity

'protects government officials from liability for civil damages insofar as their conduct does not

violate clearly established statutory or constitutional rights of which a reasonable person would

have known.'" *Id.* (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "This doctrine balances competing concerns: On one hand, it protects a government official's ability to function without the threat of distraction and liability; and, on the other hand, it affords members of the public the ability to vindicate constitutional violations by government officials who abuse their offices." *Id.* (citations and internal quotation marks omitted).

"Determining whether a defendant state officer is entitled to qualified immunity involves two inquiries: '(1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation.'" *Id.* (quoting *Williams v. City of Chi.*, 733 F.3d 749, 758 (7th Cir. 2013)). "If *either* inquiry is answered in the negative, the defendant official is entitled to summary judgment." *Id.* The two prongs of the qualified immunity inquiry may be addressed in either order. *Id.* (citing *Pearson*, 555 U.S. at 236). "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (citing *Malley v. Briggs*, 475 U.S. 335, 343, 341 (1986)).

Turning to the second prong of the qualified immunity defense, Billingsley bears the burden of defeating this prong "either by identifying a closely analogous case or by persuading the court that the conduct is so egregious and unreasonable that, notwithstanding the lack of an analogous decision, no reasonable officer could have thought he was acting lawfully." *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 723-24 (7th Cir. 2013) (citation omitted). In an attempt to identify a closely analogous case, Billingsley first points to Seventh Circuit cases, *Sallenger v. Oaks*, 473 F.3d 731, 741-42 (7th Cir. 2007), and *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir.

1996). (DE 33 at 15-16).

Neither of these cases, however, is closely analogous to the instant circumstances. In *Sallenger*, the officers repeatedly struck the plaintiff with closed-fist blows and blows with a flashlight after he was handcuffed and placed in a hobble, and "*after* he had stopped trying to kick or move." 473 F.3d at 741-42 (emphasis added). And *Clash* involved an officer shoving the plaintiff into a police car when the plaintiff was not actively resisting. 77 F.3d at 1047. But here, it is undisputed that Billingsley was still actively resisting Officer Caudill at the time the strikes were delivered.

Billingsley also cites a district court case from the Eastern District of New York, *Harrell v. County of Hassau*, No. 10-CV-5894 (MKB), 2013 WL 5439137 (E.D.N.Y. Sept. 27, 2013). In *Harrell*, the court denied qualified immunity to an officer who, according to the plaintiff, punched the plaintiff in the head while he was crying and combative, in extreme pain after being shot in the back, and was being restrained on a stretcher. *Id*. at *2, 8-9. The facts in *Harrell*, however, are not closely analogous either. Harrell was not under arrest; the strike delivered by the officer occurred within a few minutes of the officer's encountering Harrell; there were material factual disputes about the events that precluded summary judgment; and when accepting Harrell's version of the facts, the officer punched him without provocation. *Id*. at *6, 12. In contrast, here there is no dispute that Billingsley had been arrested; that he had a proclivity for violence given that he had threatened Heaton earlier that night with a knife; that he did not have a gunshot wound or other serious injury; that he had repeatedly threatened Officer Caudill throughout the transport and in the hospital room; that he had intentionally kicked Officer Caudill in or near his abdomen; and that Officer Caudill had first tried lesser force to help calm Billingsley.

Furthermore, even if *Harrell* was not distinguishable, "[w]hen looking at closely analogous cases to determine if a right was clearly established at the time of the violation, we look first to controlling precedent on the issue from the Supreme Court and to precedent from this Circuit." *Estate of Escobedo v. Bender*, 600 F.3d 770, 781 (7th Cir. 2010). "In the absence of controlling precedent, we must broaden our survey to include all relevant case law in order to determine whether there was such a clear trend in the case law that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time." *Id.* (citation and internal quotation marks omitted). Therefore, Billingsley's citation of one district court case from outside the Seventh Circuit is insufficient to establish "a clear trend in the case law that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time." *Id.* (citation and internal quotation marks omitted).

The only remaining avenue open to Billingsley to defeat the defense of qualified immunity is to show that Officer Caudill's conduct was "so egregious as to be recognized universally by law enforcement officers as unlawful." *Gibbs*, 755 F.3d at 541. But as already discussed *supra*, there is no dispute that Billingsley was clearly not subdued at the time the strikes were delivered; rather, he was actively resisting Officer Caudill by kicking him in or near his abdomen. As such, a reasonable police officer could have felt threatened by Billingsley's kick. *See, e.g.*, *Griggs*, 841 F.3d at 315-16; *Hamilton for J.H.*, 2017 WL 5467038, at *8-9. Although Officer Caudill might have used less forceful conduct, there was no settled authority to put Officer Caudill on notice that his use of two strikes to the head to subdue Billingsley in such circumstances violated Billingsley's constitutional rights. *See, e.g.*, *Griggs*, 841 F.3d at 315. The use of such force was indeed effective for its purpose—Billingsley became subdued long enough for the Officers to

apply the leg restraints. *See, e.g.*, *id*. at 316.

In sum, even if there were a constitutional violation (and the Court has concluded that there was not), Billingsley fails to defeat the second prong of the qualified immunity defense by showing that the constitutional right was clearly established at the time of the alleged violation. As such, Billingsley has failed to bear his burden of defeating Officer Caudill's defense of qualified immunity, and therefore, Officer Caudill is entitled to summary judgment on the basis of qualified immunity as well.

### E. The State Law Assault and Battery Claims

As a final matter, Defendants seek summary judgment on Billingsley's state law assault and battery claims. "Under Indiana law, a police officer may use only the force that is reasonable and necessary for effecting an arrest." *Fidler v. City of Indianapolis*, 428 F. Supp. 2d 857, 866 (S.D. Ind. 2006) (citing Ind. Code § 35-41-3-3(b)). "If a police officer uses unnecessary or excessive force, the officer may commit the torts of assault and battery." *Id*. (citing *Crawford v. City of Muncie*, 655 N.E.2d 614, 622 (Ind. Ct. App. 1995); *City of South Bend v. Fleming*, 397 N.E.2d 1075, 1077 (Ind. Ct. App. 1979)); *see also Lessley v. City of Madison, Ind*., 654 F. Supp. 2d 877, 914 (S.D. Ind. 2009). Therefore, "Indiana's excessive force standard effectively parallels the federal standard . . . ." *Fidler*, 428 F. Supp. 2d at 866 (citing *O'Bannon v. City of Anderson*, 733 N.E.2d 1, 3 (Ind. Ct. App. 2000)).

For the reasons already explained, there is no material factual dispute that requires a jury, and the Court has determined as a matter of law that Officer Caudill's use of two strikes to Billingsley's head was objectively reasonable under the circumstances and did not constitute excessive force. Accordingly, summary judgment will be granted in Defendants' favor on

Billingsley's state law assault and battery claims as well.

## V.  CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (DE 24) is

GRANTED. The Clerk is DIRECTED to enter a judgment in Defendants' favor and against

Billingsley.

SO ORDERED.

Entered this 20th day of December 2018.

 /s/ Susan Collins_____
Susan Collins
United States Magistrate Judge
